**Neal P. WARD et al., Appellants,**

**v.**

**C. A. VAUGHN et al., Appellees.**

No. 13066.

Court of Civil Appeals of Texas.

Galveston.

Feb. 7, 1957.

Stanley D. Baskin, Pasadena, for appellant G. Bryan.

Nat Friedman and Thomas E. Mosheim, Houston, for appellees.

GANNON, Justice.

This appeal is from a judgment in favor of Southeast Lumber Company and against Neal P. Ward and G. Bryan for the balance due on a note dated May 9, 1955, in the principal amount of $5,547.13, payable to the First National Bank in Houston sixty days after date and executed by Neal

P. Ward and G. Bryan as makers. The note was endorsed by Southeast Lumber Company, by C. A. Vaughn. Southeast Lumber Company is a partnership composed of C. A. Vaughn and R. A. Lohse. When the note became due it was not paid by the makers Ward and Bryan, or either of them, and thereafter Southeast Lumber Company as endorser paid the amount due on the note to the payee, First National Bank in Houston, and took an assignment of the bank's rights. This suit followed. Both Neal P. Ward and G. Bryan appeal, but Ward has filed no brief.

Trial was to the court without a jury and the single question to be decided is whether there is evidence to support the trial court's implied finding that the appellant, G. Bryan, did not, as claimed by him, place his name on the note as maker for the sole accommodation of the plaintiffs.

### Facts.

The plaintiff partnership, Southeast Lumber Company, is engaged in the retail lumber business. The defendant, G. Bryan, or the company of which he is president, is a developer of residential real estate. The defendant, Neal P. Ward, is a builder engaged in the business of purchasing and improving residential real estate for re-sale.

In the latter part of 1954 Mr. Ward had acquired and was erecting houses on lots in Section 2 of Stadium Estates, a residential subdivision, developed and being marketed by Republic Investment Corporation. The defendant Bryan is president of that corporation. Mr. Ward purchased on credit from Southeast Lumber Company considerable material which went into the houses being constructed by him in Section 2 of Stadium Estates.

On or about January 5, 1955, Southeast Lumber Company, being desirous of payment of Ward's past due account, discussed the account with both of the defendants—that is to say, with Neal P. Ward and G. Bryan. In the course of the discussions it developed that Ward would probably need additional lumber on credit. The credit of Southeast Lumber Company was itself considerably strained, it being indebted to its own suppliers who were pressing for payment. An arrangement was finally made under the terms of which Ward and Bryan, as makers, executed and delivered their sixty-day note dated January 5, 1955, in the principal amount of $10,000, payable to Southeast Lumber Company, bearing interest at 5% per annum from date until paid. The statement of facts is not clear, but evidently this note was discounted or pledged at the bank by Southeast Lumber Company. There is evidence that the $10,000 principal amount of the note was not the exact amount of the past due account of Mr. Ward, but was in excess thereof and intended to cover in part contemplated future purchases. This note is in the record and bears the endorsement of the makers, Neal P. Ward and G. Bryan, as well as that of Southeast Lumber Company and the partners thereof. Upon this note coming due, it was renewed by the execution and delivery to the First National Bank in Houston as payee of another note dated March 10, 1955, in the principal sum of $6,988.89, being the then actual amount of the unpaid balance of Ward's account with Southeast Lumber Company. This new note was made payable sixty days after date and was signed as makers by Neal P. Ward and G. Bryan. It was also endorsed by Neal P. Ward, G. Bryan, C. A. Vaughn, and R. A. Lohse. Upon the coming due of the second note dated March 10, 1955, it was renewed in the amount of the unpaid principal of $5,547.13 by another note dated May 9, 1955, payable sixty days after date to the order of the First National Bank in Houston. This last renewal note, which is the one involved in this case, was executed and signed by Neal P. Ward and G. Bryan as makers, but not endorsed by them. It is, however, endorsed by Southeast Lumber Company by C. A. Vaughn, partner, and upon being paid by

Southeast Lumber Company, plaintiff here, was endorsed over by the bank to Southeast Lumber Company without recourse.

The first of the series of notes shows payment of interest to March 10, 1955, and a $3,011.11 payment on account of principal, leaving a principal balance of $6,988.89 which is the face amount of the renewal note dated March 10, 1955. The latter note bears endorsements showing payment of interest to May 9, 1955, and payments on account of principal to leave a balance due of $5,547.13 which is the principal amount of the second renewal note sued on. This note shows a payment of interest to August 2, 1955, and a principal payment of $500 to reduce the principal due to $5,047.13.

Questioned about why he signed the original note of January 5, 1955, Mr. Bryan testified as follows:

"Q. Now, it is also your testimony that you signed these notes for the purpose of lending credit to Mr. Ward, isn't it? In other words, you signed for the purpose of lending credit to him? A. I don't believe I testified that.

"Q. I say, is that your testimony?

"Mr. Walker: I object, Your Honor.

"Q. (By Mr. Friedman) All right. Why did you sign the notes? The first note, January 5, 1955, why did you sign it? A. To help Mr. Vaughn.

"Q. In other words, to help extend credit to him? A. No, sir. I believe they wanted to get something by themselves.

"Q. *But, actually, you wanted to help Mr. Ward?* A. *Mr. Ward in what way, sir?*

"Q. *I am asking you, sir. You wanted to help him, didn't you?* A. *That is a fine point there. In the signing of the notes?*

"Q. *Yes.* A. Yes, sir, I did."
(Emphasis supplied.)

Mr. Vaughn, one of the partners in Southeast Lumber Company, testified:

"Q. Who bought this lumber that we are talking about here that forms the basis of these lumber bills? A. Mr. Ward and Mr. Bryan. They were in together, working hand in hand. The reason we sold Mr. Ward the lumber was because of Mr. Bryan's word and because Mr. Bryan had a backing, and we felt like we were safe in getting the money.

"Q. Did your salesman go to see Mr. Bryan? A. If he couldn't find Mr. Bryan, he went to Mr. Ward. He talked to both of them and called Mr. Ward, because he was the field man and was out there more than Mr. Bryan.

"Q. Who was the lumber billed out to, Mr. Vaughn? A. It was billed out to—some of it was billed to Ward and some of it—the orders there show that it is all signed for.

"Q. Now, what was the consideration for this note here that you asked them to sign? A. *It was for lumber.* They promised this and that. Finally, they signed a note. When they quit paying it, that is what brought up the suit. We had to sue and try to get our five thousand some-odd dollars.

"Q. Did those notes, each time as they were made, represent the balance Mr. Ward owed to Southeast Lumber Company? A. Yes, sir. We were all in together. We all went—We had an understanding all the way through, and *we were depending on Mr. Bryan,* although they both signed the note."

* * * * * *

"Q. And the sole purpose of the note was to enable you to raise cash by taking that note to the bank? A.

Well, that is not the sole purpose. We wanted to pay for lumber and needed cash to run the business on. If everybody stood off and didn't pay us anything, we would soon be out of business. They said they couldn't pay, so we signed a note. Mr. Bryan said, 'I will pay you $500.00 a month for 10 months, plus interest.' We left the office with that understanding, but he never paid a nickel on it.

"Q. Who got the money from The First National Bank, represented by this note in this suit here? A. Southeast Lumber Company, I guess.

"Q. And Southeast Lumber Company got the face amount or the consideration for each of the notes? A. Yes, sir. Then, when they weren't paid, we had to pay them ourselves.

"Q. In other words, that note was a credit instrument for you, rather than anything else, wasn't it, Mr. Vaughn? A. No, not a credit. *It was a note signed to be paid.* Of course, it was past due, so we get another note signed and go along with the bank and Mr. Bryan and Mr. Ward.

"Q. But, it is your understanding that the note was to represent the balance owing the Southeast Lumber Company at the time that note was given? A. That was the balance due *from Mr. Bryan and Mr. Ward* to the Southeast Lumber Company." (Emphasis supplied.)

Additional testimony by Mr. Vaughn is as follows:

"Q. Mr. Vaughn, do you recall the incident which brought about the discussion of this note of January 5, 1955, and particularly with reference to any conversation that you had with Mr. Bryan and Mr. Ward or Mr. Ward and Mr. Bryan individually? A. Yes, we talked about it. I says, 'all we want to do—' We sold the lumber. 'We want to get our money and we don't

want to cause you any trouble. We borrowed money from the bank and the bank wants us to pay.' And he said, 'All right.' So, everything was fine. *I still liked Mr. Bryan. He bought the lumber and built houses and he signed the note and paid down on it down to five thousand and something, and that is what he owes now.* Then, we had a meeting. I said, 'How about paying off the five thousand and something?' He said, 'I don't have the money.' I said, 'All right. You can handle it to be easy on yourself, but I want to get it paid.' He said, 'I tell you what I can do. I can pay you fellows if you will give me 10 months to do it.' He didn't do it, so that is how the trouble came up.

"Q. Let's get back to this $10,000.00 note. Did you tell Mr. Bryan that unless the note was signed that you were going to have to file a lien? A. No. We said we didn't want to get into any trouble. We wanted money for the lumber *and if he would sign the note and pay it,* then we could take the note to the bank and get the money, so they signed the note." (Emphasis supplied.)

There is additional testimony that at one time Mr. Bryan offered to transfer to Southeast Lumber Company certain property standing in the name of his brother in cancellation of the indebtedness represented by the note, but the proposition was declined since the property which Mr. Bryan offered to have transferred to Southeast Lumber Company was itself subject to a debt, and, as Mr. Vaughn put it, "When we thought it over we were taking on obligations instead of him paying us off. We turned down the proposition."

### Opinion.

 It is, of course, elementary that an accommodation maker of paper for the sole accommodation of the payee is not liable to the payee thereon. And the case is no different where the payee, after negoti-

ating the note, takes it up and obtains an assignment from a holder in due course. See New York Terminal Warehouse Co. v. Bullington, 5 Cir., 213 F.2d 340, holding that the rule protecting one holding through a holder in due course does not apply to cases where the payee or holder being so circumstanced at the start that he cannot recover thereon transfers the subject paper to an innocent third party for value, and subsequently purchases it back for value. It is also elementary that an accommodation maker for the accommodation of a co-maker is liable to a holder for value notwithstanding knowledge of such holder at the time of taking the instrument that the maker was only an accommodation party. The payee of such an instrument, though not a holder *in due course,* is a holder for value and entitled to enforce the instrument against the accommodation maker, as surety for the accommodated party. J. I. Case Threshing Mach. Co. v. Howth, 116 Tex. 434, 293 S.W. 800. Nor does payment by an endorser discharge the instrument so as to preclude suit thereon against those liable primarily or as surety for a co-maker. Fox v. Kroeger, 119 Tex. 511, 35 S.W.2d 679, 77 A.L.R. 663; Cook v. Service Finance Corporation, 143 Tex. 211, 183 S.W. 2d 436.

Sections 24, 25, 26, and 29 of the Uniform Negotiable Instruments Act, Article 5933, Rev.St.Tex., have application to this controversy. They read as follows:

"Sec. 24. Every negotiable instrument *is deemed prima facie to have been issued for a valuable consideration;* and every person whose signature appears thereon to have become a party thereto for value.

"Sec. 25. Value is any consideration sufficient to support a simple contract. *An antecedent or pre-existing debt constitutes value;* and is deemed such whether the instrument is payable on demand or at a future time.

"Sec. 26. Where value has at any time been given for the instrument, the holder is deemed *a holder for value* in respect to all parties who became such prior to that time.

\* \* \* \* \* \*

"Sec. 29. An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument *to a holder for value,* notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party. Id." (Emphasis supplied.)

■■ It is evident from the foregoing quoted provisions of the statutes and numerous decided cases that, as stated by Judge Speer of the Fort Worth Court in First National Bank of Fort Worth v. Brown, Tex.Civ.App., 172 S.W.2d 151, 154: "It is only in those cases where the note is executed for the sole purpose of negotiation by the payee, and thereby to procure credit, that the signing will be deemed an accommodation note for the payee." Where the accommodation signing is to accommodate a co-signer, the accommodating party becomes liable to the payee as a surety on the instrument for his co-maker. J. I. Case Threshing Machine Co. v. Howth, supra.

■■ Though there are no findings of fact or conclusions of law in the record, we must presume in favor of the trial court's judgment that he found every fact which has basis in the evidence in such a way as to support the result reached. Here, in our opinion, there is ample evidence to authorize the trial court's presumed finding that Mr. Bryan did not, as claimed by him, sign the note for the sole accommodation of Southeast Lumber Company, but rather for the accommodation of his co-signer Ward, and that in signing the note Mr. Bryan intended and expected to become liable thereon to Southeast Lumber Company as surety for Mr. Ward. The lumber company's forbearance of Mr. Ward's ante-

cedent debt was a good consideration for Mr. Bryan's undertaking. We find no support for Mr. Bryan's contention that the undisputed evidence overcomes the prima facie case which the note itself made against him.

The judgment of the trial court is affirmed.